**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **KEITH POTTS**, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. **3:11-CV-2407-L** |
| § | |
| **UNITED PARCEL SERVICE,** § | |
| § | |
| Defendant. § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is Defendant United Parcel Service's Motion for Summary Judgment,
filed December 17, 2012. After careful consideration of the motion, response, reply, record, and
applicable law, the court **grants** Defendant's Motion for Summary Judgment.

## I.        Procedural and Factual Background

Plaintiff Keith Potts ("Potts" or "Plaintiff") brought this action against Defendant United
Parcel Service ("UPS" or "Defendant') on November 15, 2011.[1] Plaintiff asserts claims for: (1)
race discrimination under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, ("Title
VII"), *as amended*, 42 U.S.C. § 2000e, *et seq.*; (2) retaliation under Title VII and 42 U.S.C.
§ 1981; (3) disability discrimination under the Americans with Disabilities Act ("ADA"), 42
U.S.C. § 12101, *et seq.*; and (4) retaliation under the Family and Medical Leave Act ("FMLA"),
29 U.S.C. § 2601, *et seq.* Plaintiff seeks back and front pay, emotional damages, liquidated
damages, damages for loss of enjoyment of life, mental anguish damages, loss of earnings
damages, interest, expert fees, attorney's fees and court costs. Potts also seeks to enjoin
Defendant from continuing to violate the ADA.

---

[1] Plaintiff filed an Amended Complaint on June 11, 2012, adding Teamsters Local Union 767 ("Local
767") as a defendant in this action; however, Local 767 was dismissed from this action on October 24, 2012,
pursuant to a joint stipulation of Plaintiff's voluntary dismissal.

On December 17, 2012, Defendant moved for summary judgment on all of Plaintiff's claims.  Plaintiff filed a response in opposition of Defendant's motion for summary judgment on January 24, 2013.  On February 13, 2013, Defendant filed a reply and objections to Plaintiffs' summary judgment evidence.  Plaintiff did not respond to Defendant's objections to his summary judgment evidence.

The court now sets forth the facts in accordance with the standard set forth in section II of this opinion.  UPS is a worldwide shipping company that delivers packages through a complex network of air and ground transportation systems.  UPS hired Potts, who is African-American, in February 1986 to work part-time loading and unloading aircraft at Dallas-Fort Worth International Airport.  He worked in various positions before assuming the position of a "feeder"[2] truck driver in 2005.  As a feeder driver, Potts was responsible for driving a tractor-trailer, commonly referred to as a "feeder" by UPS, from the Dallas Hub to various UPS locations around the DFW Metroplex.   He held this position until March 2011, at which time he was terminated.

During his employment with UPS, Potts suffered from gout, rheumatoid arthritis, and psoriasis.  According to Plaintiff, the gout made it difficult for him to walk or extend his elbow, and the rheumatoid arthritis sometimes made it difficult for him to sometimes drive and lift things.  Beginning in 2007, Potts began taking intermittent FMLA leave for his gout condition.  No work restrictions, however, had been placed on him at UPS as a result of either the gout or rheumatoid arthritis.  With respect to Plaintiff's psoriasis, this condition prevented him from shaving regularly due to psoriatic inflammation that would result from using a razor.  As a result,

---

[2] UPS commonly refers to its tractor-trailers as "feeders."  As the court understands it, smaller vehicles, known as "package cars," pick up packages in one location and are brought back to a local facility for sorting.  The packages are then loaded onto feeders destined for different locations.  The feeders are then transported to other locations where the packages are unloaded and sorted onto package cars for final delivery.  Def.'s App. 282.

**Memorandum Opinion and Order - Page 2**

Plaintiff was given a "shaving waiver" exempting him from a requirement in UPS's General Appearance Guidelines that he be clean shaven.  Potts was instead allowed to maintain a "closely-trimmed" beard.  He contends that his shaving exemption was a "consistent" point of contention between him and then-Dallas Feeder Manager, Wayne Williams ("Williams"). According to Plaintiff, when he first presented his shaving waiver to Williams, he commented that it was "going to be a problem."  Further, Plaintiff alleges that Williams, at times, would tell him that he needed to "clean up" his beard and called him names such as "wild man," or "wolfman."   Other than being exempt from the shaving requirement, there were no other limitations placed on Potts at UPS as a result of his psoriasis.

On March 16, 2011, Plaintiff was involved in two accidents while on the job.  While driving his feeder truck eastbound in the middle lane on a three-lane road, another driver struck the back left tire of his vehicle while attempting to change lanes.  The impact caused the other driver to lose control, cross the median and enter into the oncoming lanes of the road before crashing into a concrete barrier.  Potts pulled over into the median to the left of the eastbound lanes, which was located at the crest of a hill and sloped slightly downwards, and exited the truck to render assistance to the other driver.  At some point, the 18-wheeler feeder truck rolled approximately 300 yards across the eastbound lanes of the road, down an embankment, and into a creek that feeds into the Trinity River.  The incident cost UPS $1,047.50 in towing costs, $1,316.73 for environmental cleanup, and $13,603.35 for repair costs.  Pursuant to company policy, Plaintiff was immediately taken out of service, pending the final results of the accident investigation.  UPS's investigation revealed that Potts failed to set the parking brake before exiting the feeder truck and that the vehicle's parking brake and transmission assembly were functioning properly.  After the investigation was completed, Dallas Feed Manager Keith Murray

("Murray") reviewed the investigation findings and documentation and made the decision to terminate Potts for what he deemed to be an avoidable runaway accident. Potts was terminated on March 23, 2011.

As a UPS feeder driver, Potts was covered by a collective bargaining agreement ("CBA") between UPS and the International Brotherhood of Teamsters ("the Union"). The CBA governs the wages, hours, and terms and conditions of employment of all bargaining unit employees at UPS. It also covers in detail the appropriate grounds and procedure for termination of a UPS feeder driver. Under Article 52 of the CBA, a covered employee may be discharged only for just cause and after at least one formal warning has been issued to that employee. Article 52, however, also enumerates a class of offenses for which an employee may be terminated immediately and without prior warning. This list of offenses is commonly referred to as "cardinal sin infractions." An "avoidable runaway accident" is expressly listed as an infraction justifying immediate termination.

The CBA further provides for a grievance procedure for covered employees, with Union representation, to challenge decisions regarding the terms and conditions of their employment, including discipline and discharge. Pursuant to the terms of the CBA, Potts filed a grievance regarding his termination. There are four formal levels of review in this grievance process: (i) a local hearing; (ii) a hearing before the Southern Regional Area Parcel Grievance Committee ("SRAPGC");[3] (iii) a hearing before the Southern Regional Deadlock Committee; and (iv) binding arbitration under the rules of the Federal Mediation and Conciliation Service. A unanimous decision at any step of the procedure is final and binding. According to UPS,

---

[3] The SRAPG is composed of six representatives from local unions and UPS districts who are not parties to the grievance. Def.'s App. 4.

because of the seriousness of Plaintiff's runaway accident, Williams, who at the time was the Labor Relations Manager, [4] maintained at both the local hearing and the SRAPGC panel hearing that he should not be reinstated.  The SRAPGC unanimously denied Potts's grievance and upheld his termination for an avoidable runaway accident.

## II.    Motion for Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  On the other hand, "if the movant

---

[4] Williams was the Dallas Feeder Manager from January 1, 2003, until September 15, 2009, when he became the Red River District Labor Relations Manager.  Def.'s App. 1.

bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Id.* (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on

which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.   Analysis

Defendant contends that it is entitled to summary judgment because Potts cannot demonstrate that a genuine dispute of material fact exists regarding any of his claims. Specifically, UPS argues that Potts cannot establish a *prima facie* case of race discrimination under Title VII or 42 U.S.C. § 1981, disability discrimination under the ADA, or retaliation under the FMLA.   Defendant further asserts that Potts cannot produce specific evidence that UPS's proffered nondiscriminatory reason for terminating him—a serious avoidable runaway accident—is pretext for unlawful discrimination or retaliation.   Accordingly, Defendant requests the court to grant summary judgment on each of Plaintiff's claims and that this case be dismissed as a matter of law.

### A.   Race Discrimination Under 42 U.S.C. § 1981 and Title VII

Section 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State" to "make and enforce contracts." 42 U.S.C. § 1981(a). The Fifth Circuit evaluates employment discrimination claims brought under § 1981 using the same analysis as that used under Title VII. *Lawrence v. University of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999) (per curiam).

Title VII prohibits discrimination on the basis of "race, color, religion, sex, or national origin."   42 U.S.C. § 2000e–2(a)(1).   As Potts offers only circumstantial evidence of discrimination, his Title VII claims are analyzed using the modified *McDonnell Douglas* burden-shifting paradigm.   *See Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010).   To survive a motion for summary judgment under the modified *McDonnell Douglas* paradigm, a Title VII

plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).   To establish a *prima facie* case of discrimination, a plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for the position at issue; (3) he was the subject of an adverse employment action; and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.  *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011); *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009) (addressing racial discrimination claim).

"In work-rule violation cases, a Title VII plaintiff may establish a prima facie case by showing 'either that he did not violate the rule or that, if he did, [employees outside the protected class] who engaged in similar acts were not punished similarly.'" *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (quoting *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980)).  To establish a *prima facie* case in the second manner, the plaintiff "must show that . . . employees were treated differently under circumstances 'nearly identical' to" h[is]." *Id.* (citations omitted).  "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories."  *Lee*, 574 F.3d at 260 (citations and footnotes omitted).

Once this *prima facie* case has been established, there is a presumption of discrimination, and the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for

the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802-04. "The burden on the employer at this stage is one of production, not persuasion; it can involve no credibility assessment." *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. Tex. 2007) (citations and internal quotation marks omitted). If the employer sustains its burden, the inference of discrimination disappears, and "the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic. *Id.* (citation omitted).

UPS contends that Potts cannot establish the fourth element of his *prima facie* case of race discrimination under Title VII or 42 U.S.C. § 1981 because there is no evidence that other similarly situated Caucasian drivers were treated more favorably than him under nearly identical circumstances.

In his Response, Potts identifies six Caucasian feeder drivers—Patrick Desjardin ("Desjardin"), Gary Tidwell ("Tidwell"), Paul Dillon ("Dillon"), Patrick Rogers ("Rogers"), Greg Savoy ("Savoy") and Dave Gerber ("Gerber")—with whom he contends he is "similarly situated." He asserts, without citing any evidence, that all either shared the same supervisor or had their employment status determined by Williams. He further states, in conclusory fashion, that they all had "essentially comparable violation histories" of a "cardinal sin infraction," meaning they were subject to automatic termination under Article 52. Potts provides no details, however, regarding each of his alleged comparators' "cardinal sin infractions," and his citations to the record in support of his contention that each had a cardinal sin accident do not exist. Specifically, Potts cites to pages 163, 165-166 in his Appendix, but these pages do not exist, as the pagination of his Appendix ends at page 162 and does not begin again until twenty-four

**Memorandum Opinion and Order - Page 9**

pages later, at page 175.  Potts concedes that all of these individuals were similarly disciplined for their infractions, as they were all discharged; however, he contends, again, without citing any evidence, that all of these individuals had their employment reinstated by Williams, acting as the Labor Relations Manager, after the initial termination without the case going to the SARPGC panel.  Potts states that the conduct of three of the six drivers he identifies—Tidwell, Rogers, and Dillon—can be classified as "nearly identical" to his.  Potts fails to provide evidentiary support for his position, other than his conclusory allegations, which are insufficient to defeat a motion for summary judgment.  As the party opposing summary judgment, Potts is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim.  *Ragas*, 136 F.3d at 458.  This, however, he fails to do.

Defendant disputes that that six drivers Potts identifies are comparators are similarly situated to him.  With respect to Desjardin, Rogers, and Tidwell, UPS contends that Williams did not handle their grievances.  According to Defendant, Potts's own proffered evidence reveals that the grievances of Desjardin and Rogers were handled by a different Labor Relations Manager five to six years before Williams assumed the position.  Specifically, UPS cites to former feeder driver Charlie Zajicek's deposition testimony stating that Rogers's accident occurred "four to five years ago, maybe," that Desjardin's accident occurred "maybe five to six years ago," and that Williams was not the Labor Relations Manager at the time of either accident.  *See* Pl.'s App., Zajicek Dep. at 41, 44-45.  Defendant argues that this is too remote in time to be considered sufficiently comparable.  It is unclear to the court, however, upon what basis UPS believes Zajicek's deposition testimony establishes that Rogers's and Desjardin's grievances were handled five to six years before Williams took over the position.  The court finds that Zajicek's testimony only establishes that the accidents occurred four to six years prior

to the date of his deposition, which was October 4, 2012, not prior to the date Williams assumed the position of Labor Relations Manager.  In any event, the court agrees with Defendant that Potts's summary judgment establishes that Williams was not Labor Relations Manager, and, thus, decisionmaker with respect to Rogers and Desjardin's grievances.  "Employees with different supervisors, . . . or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated." *Lee*, 574 F.3d at 259 (citation and footnote omitted).  Not only were these two drivers reinstated by a different Labor Relations Manager following their discharge, these events took place at least three years before Potts's accident.  The court therefore concludes that Rogers and Desjardin are not sufficiently similarly situated to Potts.

UPS further argues that, contrary to Potts's assertion, Williams was not the Labor Relations Manager at the time Tidwell was discharged.  Potts's assumption appears to be based on Zajicek's deposition testimony, wherein he states that Williams reinstated Tidwell following his discharge.  *See* Pl.'s App., Zajicek's Dep. at 21-22.  UPS contends that this assumption is inaccurate; however, it cites only to Williams's declaration stating that he became Labor Relations Manager in September 2009, and his deposition testimony asserting that he "never heard a Gary Tidwell case" as the Labor Relations Manager.  *See* Def.'s App. 1; Pl.'s App. 147. The court does not know the date Tidwell was discharged, and Williams's deposition testimony that he never heard a Tidwell case as the Labor Relations Manager conflicts with Zajicek's deposition testimony that Williams was the Labor Relations Manager at the time Tidwell was discharged.  The issue of whether Williams was the Labor Relations Manager at the time Tidwell was discharged and reinstated, however, is immaterial to the court's analysis, as it finds that Tidwell is not similarly situated to Potts.  *See Anderson*, 477 U.S. at 248 (noting that disputed

fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion).

The court agrees with Defendant that Tidwell, as well as Dillon, Savory, and Gerber, are not similarly situated with Potts, as he provides no competent summary judgment evidence that their alleged accidents were nearly identical to his. Fifth Circuit case law makes clear that "the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Lee*, 574 F.3d at 260 (citations and footnote omitted). Potts offers no details regarding these alleged accidents; he merely makes the conclusory allegation that each driver had a "cardinal sin" infraction. Potts's conclusory allegation, however, is not competent summary judgment evidence. *Eason*, 73 F.3d at 1325. Moreover, that the other drivers allegedly had Article 52 infractions does not necessarily establish that their conduct is "nearly identical," to his, because, "[a]s the Supreme Court has instructed, the similitude of employee violations may turn on the 'comparable seriousness' of the offense for which discipline was meted out and not necessarily on how a company codes an infraction under its rules and regulations." *Lee*, 574 F.3d at 261 (citation and footnote omitted). Thus, Potts need also establish that the other drivers had accidents of comparable severity, because "[i]f the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer,' the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* at 260 (citation and footnote omitted). Potts fails to do so.

To the extent, if any, that Potts relies on his own deposition testimony or that of Zajicek's as proof that the conduct of Savoy, Gerber, Dillon, and Tidwell is nearly identical to his, the court agrees with UPS that such testimony is not competent summary judgment evidence, as it

appears to be entirely based on hearsay and has not otherwise been substantiated.   In his deposition, Potts testified that Savoy had "numerous accidents, including rollaways, and flipped over trailers and [was] still allowed to work." Pl.'s App. 124.  Potts, however, also testified that he learned of Savoy's alleged "rollaways" through "shop talk," and did not know any further details regarding the accident or who was the feeder manager at the time. *Id.*  Moreover, Potts testified that Gerber had a rollaway accident on the yard at UPS, but he was not pulled out of service following the accident.  According to Potts, he learned about the accident from "one of the shifters on the yard" who told him that Gerber's "dolly"[5] came apart from his trailer and rolled under another trailer, damaging the dolly.  *Id.* at 122.   It is apparent from Potts's deposition testimony that his knowledge of his alleged comparators' accidents is limited and is based on nothing but hearsay within hearsay.

With respect to Zajicek's deposition testimony, he testified that Dillon had an accident where he allegedly rear-ended a dump truck; however, he also indicated that this accident occurred two years after he retired from UPS and everything he learned about the accident, he learned secondhand from other drivers.  Pl.'s App., Zajicek Dep. at 33-34.  Zajicek further testified that Tidwell had a rollaway accident wherein his "tractor rolled down and hit a pole" at the "fueler staging area at the Dallas feeders"; however, he also testified that he had no direct involvement in the accident, and everything he knows about it came from Tidwell and what was discussed "in the safety committee."  *Id.* at 42.  Zajicek's testimony, like Potts's is also limited, as it based on what he learned secondhand from others.

---

[5] In his deposition, Potts describes a "dolly" as instrument used to "pull another trailer with."  Pl.'s App. 122.

**Memorandum Opinion and Order - Page 13**

The court therefore determines that Potts and Zajicek's inadmissible testimony regarding Savoy, Dillon, Gerber, and Tidwell's accidents are not competent summary judgment evidence and may not be considered by the court.  *See Forsyth*, 19 F.3d at 1533.  Accordingly, the court concludes that Potts has failed to demonstrate that he was treated less favorably because of his membership in a protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.

Further, Defendant asserts that, even assuming that Potts can establish a *prima facie* case of race discrimination, he cannot produce specific evidence that UPS's proffered nondiscriminatory reason for terminating him—his avoidable runaway accident—is pretext for unlawful discrimination.  Thus, Defendant contends that there is no genuine dispute of material fact as to discriminatory intent or pretext, and it is entitled to summary judgment on Potts's race discrimination claims.  The court agrees.

The court determines that UPS has plainly articulated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment.  Defendant has established that Article 52 of the CBA expressly allows for immediate termination of employees who have avoidable runaway accidents.  Further, Defendant has produced evidence demonstrating that after conducting an investigation, it reasonably, and in good faith, determined that Potts had an avoidable runaway accident.  Further, UPS has established that it had a good faith belief that the accident was serious, which it states is the reason why it did not voluntarily reinstate him.  According to UPS, Potts's accident cost them almost $16,000 in repairs, and more important than the economic costs, the runaway accident placed the public at extreme risk of injury.

In his Response, Potts does not dispute that that he had an avoidable runaway accident or that Article 52 provides for automatic termination for having such an accident.  Potts contends

that although UPS uniformly imposes automatic termination for employees who have avoidable runaway accidents, it has a practice of reinstating such employees after the Article 52 termination.  According to Potts, his race played a motivating factor in UPS's decision not to reinstate him; however, he offers no evidence to support this belief.  Potts does not dispute the seriousness of his accident, which is UPS's stated reason for not reinstating him.  Potts merely argues that since he was not reinstated and all of his purported comparators were reinstated, the decision not to reinstate him was based on his race, as this is the only difference between him and his comparators.  As previously stated, Potts has not demonstrated that the six drivers he identifies are similarly situated to him.  Moreover, his conclusory and speculative assertion that Defendant's decision not to reinstate him was motivated by his race because the white drivers he identifies were reinstated while he was not, is insufficient to create a genuine dispute of material fact that UPS's proffered reasons for his termination and for not reinstating him are pretextual.  Accordingly, the court determines that Defendant is entitled to judgment as a matter of law on Potts's race discrimination claims under 42 U.S.C. § 1981 and Title VII.

### B.     Retaliation Under 42 U.S.C. § 1981 and Title VII

Like discrimination claims, retaliation claims brought under § 1981 are analyzed under the same standard as those brought under Title VII.  *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002) (citations omitted).

It is "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice" under Title VII, or "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 269

(2001). Whether the employee opposes an unlawful practice or participates in a proceeding against the employer's activity, the employee must hold a reasonable belief that the conduct he opposed violated Title VII. *Long v. Eastfield Coll.*, 88 F.3d 300, 305 (5th Cir. 1996).

To establish a *prima facie* case of retaliation in this circuit, a plaintiff must show that: (1) he engaged in a protected activity; (2) he experienced an adverse employment action following the protected activity; and (3) a causal link existed between the protected activity and the adverse employment action. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007) (footnote and citation omitted); *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001); *Mota v. University of Texas Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001). The establishment of a *prima facie* case gives rise to an inference of retaliation. *Montemayor,* 276 F.3d at 692. This inference, in turn, shifts the burden of production to the defendant, who must then articulate a legitimate, nondiscriminatory or nonretaliatory reason for the challenged employment action. *McCoy*, 492 F.3d at 557. Once a defendant articulates such a reason, the inference of discrimination or retaliation raised by the *prima facie* showing drops from the case. *Montemayor,* 276 F.3d at 692.

At this juncture, the plaintiff bears the burden of establishing that the employer's stated reason is a pretext for the real retaliatory purpose. *McCoy*, 492 F.3d at 557 (citation omitted). "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *University of Tex. Sw. Med. Ctr. v. Nassar*, —, U.S. —, 133 S. Ct. 2517, 2533 (2013). If the employee fails to prove, or raise a genuine dispute of material fact,

**Memorandum Opinion and Order - Page 16**

that the employer's real reason is a pretext for its allegedly retaliatory conduct, the defendant is entitled to summary judgment. *See McCoy*, 492 F.3d at 561-62.

In *Burlington Northern & Santa Fe Ry. Co. v. White*, the Supreme Court held that, because the discrimination and retaliation provisions of Title VII have different statutory language and different purposes, "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." 548 U.S. 53, 64 (2006). Consistent with this view, the Court held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory action "materially adverse" in that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citation omitted). In so ruling, the Court rejected Fifth Circuit authority, *id.* at 67, which defined adverse employment actions as "ultimate employment decisions" and limited actionable retaliatory conduct to acts "such as hiring, granting leave, discharging, promoting, and compensating." *Id.* at 61 (quoting *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997)). In evaluating whether actions are materially adverse, the Court went on to hold that "petty slights, minor annoyances, and simple lack of good manners will not" deter or dissuade a reasonable employee from making or supporting a charge of discrimination, and therefore they do not constitute conduct that is "materially adverse." *Id.* at 68.

UPS contends that it is entitled to summary judgment on Potts's § 1981 and Title VII retaliation claims because there is no evidence that he engaged in any protected activity. Even assuming Potts can establish a *prima facie* case for retaliation under § 1981 and Title VII, UPS further argues that it has met its burden of articulating a legitimate nonretaliatory reason for his termination and there is no evidence that its proffered reason is pretextual. The court agrees.

**Memorandum Opinion and Order - Page 17**

UPS asserts that Potts's deposition testimony makes no mention that he opposed any employment practices made unlawful by Title VII or participated in any Title VII proceeding prior to his termination.   In his Response, Potts asserts, for the first time, that "during the investigation and local level prehearing stage, [he] opposed being treated differently than his counterparts, Desjardins, Tidwell, Dillon, Rogers, Savoy, and Garber—giving them the common practice of overriding article 52, and reinstatement to their prior position."   Pl.'s Br. in Supp. of Resp. to Def.'s Mot. for Summ. J. 21.   In support, he cites to pages 120 and 163 of his Appendix; however, page 120 makes no reference him opposing an unlawful employment practice, and page 163 does not exist in his Appendix.   The court therefore concludes that Plaintiff has failed to produce any evidence that he opposed any practice made an unlawful employment practice by Title VII, or that he "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.    42 U.S.C. § 20003-3(a); *see also Breeden*, 532 U.S. at 269.   This failure is fatal to his retaliation claims.

Even assuming that Potts could establish a *prima facie* case of retaliation, the court has concluded that UPS has met its burden of articulating a legitimate reason for the decision not to reinstate Potts.   Potts offers no evidence regarding pretext in the context of his retaliation claims.   Specifically, he produces no evidence that UPS intentionally retaliated against him because he engaged in protected activity and that the protected activity was the but-for cause of his termination. Thus, he fails to create a genuine dispute of material fact as to pretext.   The court therefore determines that Potts fails to raise a genuine dispute of material fact with respect to his retaliation claims under 42 U.S.C. § 1981 and Title VII, and Defendant is entitled to judgment as a matter of law on these claims.

C.      <u>**Disability Discrimination Under the ADA**</u>

The ADA is an antidiscrimination statute designed to remove barriers that prevent qualified individuals with disabilities from enjoying employment opportunities available to persons without disabilities.  *Taylor v. Principal Fin. Grp., Inc.,* 93 F.3d 155, 161 (5th Cir. 1996).  The ADA prohibits discrimination against a qualified individual because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training; and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

A person "may establish a claim of discrimination under the ADA either by presenting direct evidence or by using the indirect method of proof set forth in *McDonnell Douglas Corp. v. Green.*"  *Seaman v. CSPH, Inc.,* 179 F.3d 297, 300 (5th Cir. 1999).  To establish a *prima facie* case for disability discrimination under the ADA, a plaintiff must show that he: (1) has a disability; (2) was qualified for the job; and (3) was subject to an adverse employment decision because of his disability.  *Shirley v. Precision Castparts Corp.*, — F.3d —, 2013 WL 4051760, at *3 (5th Cir. Aug. 12, 2013).

A person is disabled under the ADA if he (1) has a physical or mental impairment that substantially limits one or more of the major life activities, (2) has a record of such impairment, or (3) is regarded as having such an impairment.  42 U.S.C. § 12102(1).  To meet this definition of "disabled," a plaintiff must show that: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  *Kemp v. Holder,* 610 F.3d 231, 237 (5th Cir. 2010) (quoting *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489 (1999)).  An employer may "regard an

**Memorandum Opinion and Order - Page 19**

employee as impaired or restricted from one position or a narrow range of jobs without regarding him as disabled." *E.E.O.C. v. E.I. Du Pont de Nemours & Co.,* 480 F.3d 724, 729 (5th Cir. 2007) (quotation and footnote omitted).

Defendant contends that Potts cannot establish a *prima facie* case for discrimination under the ADA because he fails to show that he has a disability or that UPS regarded him as disabled. Further, UPS argues that Potts fails to present any evidence that its stated reasons for terminating and not voluntarily reinstating him are pretextual. Defendant therefore argues that it is entitled to summary judgment with respect to Potts's ADA claim. The court agrees.

Citing his own deposition testimony for support, Potts asserts that he has the following three disabilities: psoriasis, gout, and rheumatoid arthritis. Pl.'s Br. in Supp. of Resp. to Def.'s Mot. for Summ. J. 24.[6] He further contends, without citing to the record, that his deposition testimony establishes how these alleged disabilities substantially limit his major life activities, including "walking, seeing, working, and caring for [himself.]" The court, however, concludes that his testimony fails to demonstrate that he has a substantial limitation on any major life activity as a result of his alleged disabilities. In his deposition, Potts testified that his psoriasis did not limit his ability to do anything at UPS other than shave his face. Pl.'s App. 111. Although Potts testified that his gout made it hard for him to walk, affected his two big toes, his feet, his ability to extend his elbows, and limited his ability to move his wrist, he nonetheless testified that it did not limit his ability to do anything physically and that he had no restrictions

---

[6] Plaintiff includes in his Appendix two documents that appear to be a doctor's notes regarding his psoriasis. *See* Pl.'s App. 184, 188. These documents, however, lack foundation, are unauthenticated, and, as such, constitute inadmissible hearsay and may not be considered by the court. In any event, "[i]t is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'" *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 198 (2002), *superseded by statute on other grounds,* ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553 (2008) (citation omitted).

on what he could and could not do at UPS as a result of his gout condition.  *Id.*  Further, with respect to his arthritis, Potts testified that it affected his hands and fingers and as a result, made "it hard to drive sometimes and lift things."  *Id.* at 113-14.  Potts, however, also testified that he did not discuss his arthritis in any of the FMLA paperwork or medical documentation he submitted to UPS, was still able to drive, and had no restrictions on his driving ability as a result of the arthritis.  *Id.* at 114.  Potts further testified that he has no medical restrictions of any kind at his current job.  *Id.*  Contrary to what Potts asserts, his deposition testimony fails to establish that any of alleged disabilities limited his ability to see, work, or care for himself.  At best, Potts has established that, as a result of his alleged disabilities, his ability to shave and walk was limited.  The court notes, however, shaving is not a major life activity.  *Cf.* 42 U.S.C. § 12102(2) (defining "major life activities" as including, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working").  Further, any limitation on Potts's ability to walk was not so substantial that he was unable to do anything physically or that he had any restrictions placed on him at work.  The court therefore concludes that Plaintiff fails to establish that he had a physical impairment that substantially limited one or more life activities of such individual.

Potts additionally argues that he has a disability under the ADA because he was "regarded as" having such an impairment. This contention appears to be based on his allegations that: (1) when he presented his shaving waiver to Williams, he replied "that's going to be a problem;" (2) Williams made several comments to Potts about his beard from 2008-2009; and (3) Road Supervisor Humberto Fierro inquired about Potts "limping" and stated that arthritis

might disqualify him from driving under Texas Department of Transportation regulations in February 2011.  Pl.'s Br. in Supp. of Resp. to Def.'s Mot. for Summ. J. 25.

UPS argues that any suggestion by Potts that Fierro regarded him as being disabled is immaterial, as he was not responsible for the adverse employment action at issue in this case. Rather, it is undisputed that Williams made the decision not to voluntarily reinstate Plaintiff. The court agrees.  When examining whether Plaintiff was "regarded as" disabled, the relevant viewpoint is that of the supervisor responsible for his termination.  *See Deas v. River West, L.P.,* 152 F.3d 471, 476 n.9 (5th Cir. 1998) ("Under the 'regarded as' prong, the disability status of the plaintiff turns . . . on how the plaintiff was perceived and treated by those individuals alleged to have taken discriminatory action.  In the case at bar, the discriminatory act alleged on appeal is [plaintiff's] discharge from employment.  The summary judgment evidence indicates that Dr. Dixon, acting in her capacity as the medical director of the substance abuse unit, made the decision to discharge [plaintiff].  Thus, the opinions or perceptions of other individuals involved are of little legal significance to [plaintiff's] claim.  Dr. Dixon is the relevant decisionmaker in the case at bar, and our analysis focuses on how she perceived, and acted toward, [plaintiff].") (citation omitted).  Thus, any assertion by Potts that Fierro regarded him as being disabled does little to establish that Williams discriminated against him on the basis of his disability when he did not reinstate Plaintiff.

Further, with respect to Williams's comments about Plaintiff's beard, the court is not convinced that these comments establish that he regarded Plaintiff as disabled within the meaning of the ADA.  Even assuming that Potts can establish with sufficient evidence that Williams regarded Plaintiff as disabled within the meaning of the ADA, and, thus, establishing a *prima facie* case that he was discriminated against on the basis of his psoriasis, the court

concludes that Potts has failed to create a genuine dispute of material fact that Defendant's stated reasons for terminating and not voluntarily reinstating him are pretextual.  Plaintiff asserts that taking his "evidence as a whole, he creates a fact issue as to UPS'[s] stated reason, showing the explanation to be unworthy of credence."  Pl.'s Br. in Supp. of Resp. to Def.'s Mot. for Summ. J. 26.  Potts, however, produces no evidence to support that UPS's stated reasons are unworthy of credence or that his psoriasis likely motivated its decisions to terminate him and not to reinstate him.  Accordingly, the court concludes that he has failed to create a genuine dispute of material fact as to pretext.  Defendant is therefore entitled to judgment as a matter of law with respect to Potts's ADA claim.

### D.    **FMLA Retaliation**

Under the FMLA, an eligible employee is allowed to take up to twelve weeks of leave during any twelve-month period to attend to various family and medical issues.  *Shirley*, 2013 WL 4051760 at *4 (citation and footnote omitted).  The FMLA contains two distinct provisions. The first is a prescriptive provision that creates a serious of entitlements or substantive rights, while the second is a proscriptive provision that protects employees from retaliation or discrimination based on the exercise of those rights.  *Id.* (citations and footnote omitted).  Potts asserts a claim for retaliation under the FMLA, which falls under the second provision.

To establish a *prima facie* case for retaliation under the FMLA, a plaintiff must show that: "1) he was protected under the FMLA; 2) he suffered an adverse employment action; and 3) he was treated less favorably than an employee who had not requested leave under the FMLA or the adverse decision was made because he sought protection under the FMLA."  *Mauder v. Metropolitan Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006) (citation

omitted).  For an employee who has no direct evidence of retaliation, the familiar burden-shifting analysis applied in Title VII cases applies to FMLA cases.  *See id*.

"When evaluating whether the adverse employment action was causally related to the FMLA protection, the court shall consider the 'temporal proximity' between the FMLA leave, and the termination."  *Id.* (citation omitted).  Although the plaintiff does not have to show that the protected activity is the sole cause of his termination, he is, however, "required to show that the protected activity and the adverse employment action are not completely unrelated."  *Id.* (citations omitted).

Defendant argues that it is entitled to summary judgment on this claim because Potts cannot establish a *prima facie* case of FMLA retaliation.  UPS does not contest that Plaintiff was protected under the FMLA or that he suffered an adverse employment action; however, it contends that Potts fails to identify any alleged comparators who he claims were treated more favorably, or that the adverse decision was made because he took FMLA leave.  Moreover, Defendant argues that, even assuming Plaintiff can establish a *prima facie* case of FMLA retaliation, his claim must still be dismissed as he does not set forth any evidence of pretext.  The court agrees.

In support of his FMLA retaliation claim, Potts merely alleges that there was a close temporal proximity between his January 2011 intermittent FMLA leave request and his March 2011 discharge.  Pl.'s Br. in Supp. of Resp. to Def.'s Mot. for Summ. J. 27.  According to Potts, that the recommendation to terminate him was made just two months after he filed for FMLA protection is sufficient to raise a fact issue as to whether there is a causal link between his protected activity and his termination.  *Id.*  "While this time period is short, it is not, by itself, enough to show a causal connection based on temporal proximity alone.  *See Amsel v. Texas*

*Water Dev. Bd.*, 464 F. App'x 395, 402 (5th Cir. 2012) (holding that the time period of just over two months that occurred between plaintiff's FMLA leave and his dismissal was not close enough to establish a causal relationship) (citation omitted).   "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'"   *Clark Cnty.*, 532 U.S. at 273 (quoting *O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1253 (10th Cir. 2001), and citing *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient); *Hughes v. Derwinski,* 967 F.2d 1168, 1174-75 (7th Cir.1992) (4-month period insufficient)).

Moreover, temporal proximity alone "will not always be enough for a *prima facie* case." *Swanson v. General Servs. Admin.,* 110 F.3d 1180, 1188 n.3 (5th Cir. 1997).   Plaintiff is required to raise a fact issue showing "that the protected activity and the adverse employment action are not completely unrelated."   *Mauder*, 446 F.3d at 583; *see also Amsel*, 464 F. App'x at 402 ("Amsel is required to raise a fact question showing that the protected activity was not 'wholly unrelated' to his discharge.") (citation omitted).   Potts presents no evidence, however, that supports linking his discharge to his FMLA-protected activity.   For instance, Potts offers no evidence establishing that the decisionmaker with respect to his termination, Murray, or the decisionmaker with respect to his possible reinstatement, Williams, was aware of his January 2011 FMLA leave.   He mentions having to defend his ability to drive a UPS tractor with an arthritis limp to Fierro; however, he also fails to produce any evidence demonstrating that Fierro was aware of his January 2011 FMLA leave, and, more importantly, there is no evidence that Fierro was involved in the decision to terminate him or to not reinstate him.

The court therefore concludes that Plaintiff has failed to make a *prima facie* showing on his FMLA retaliation claim.  Even assuming that Potts could make a *prima facie* showing with respect to this claim, he offers no evidence to rebut UPS's legitimate, nondiscriminatory reasons for his termination and nonreinstatement.  Accordingly, Defendant is entitled to judgment as a matter of law on Plaintiff's FMLA retaliation claim.

## IV.     Evidentiary Objections

Defendant asserted a number of objections to Plaintiff's Response and summary judgment evidence.  Because the court relied only on admissible evidence, it **overrules** Defendant's objections **as moot**.

## V.      Conclusion

For the reasons herein stated, the court **determines** that no genuine dispute of material fact exists as to Plaintiff's claims for: (1) race discrimination under 42 U.S.C. § 1981 and Title VII; (2) retaliation under 42 U.S.C. § 1981 and Title VII; (3) disability discrimination under the ADA; and (4) retaliation under the FMLA, and UPS is entitled to judgment as a matter of law on these claims.  Accordingly, the court **grants** Defendant's Motion for Summary Judgment and **dismisses with prejudice** this action.  Judgment will issue by separate document as required by Federal Rule of Civil Procedure 58.

**It is so ordered** this 22nd day of August, 2013.

Sam A. Lindsay
United States District Judge